IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

(JACKSON)

================================================================

UNITED STATES OF AMERICA,

        Plaintiff,

Vs.                               NO. 1:22-cr-10081

DARRYL ANTHONY MCNEAL,

        Defendant.

================================================================

PROCEEDINGS

BEFORE THE HONORABLE S. THOMAS ANDERSON

Friday

2nd of August, 2024

CANDACE S. COVEY, RDR, CRR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

UNREDACTED TRANSCRIPT

A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

MR. ADAM DAVIS
MS. CAROLINE PARISH
United States Attorney's Office
109 S. Highland
Suite 300
Jackson, TN 38301
(731) 422-6220

Appearing on behalf of the Defendant:

MR. TAURUS BAILEY
Bailey & Bailey, PLLC
44 N. Second Street
Suite 502
Memphis, TN 38103
(901) 575-8702

UNREDACTED TRANSCRIPT

Friday

August 2, 2024

The Proceedings in this case began on this date, Friday, 2nd day of August, 2024, at 10:30 a.m., when and where evidence was introduced and proceedings were had as follows:

---------------------

**THE COURT:** This is United States versus Darryl Anthony McNeal, Number 22-10081.

We are here today for sentencing in Mr. McNeal's matter. Is the Government ready to proceed?

**MR. DAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Bailey, are you ready to proceed?

**MR. BAILEY:** Yes, Your Honor. Thank you.

**THE COURT:** All right. Let's see. Did the Government receive a copy of the presentence report and the first and second addendum?

**MR. DAVIS:** I did, Your Honor.

**THE COURT:** Mr. Bailey, did you receive a copy of the presentence report and the first and second addendum?

**MR. BAILEY:** I did, Your Honor.

**THE COURT:** And did you have an opportunity to review those fully and completely with Mr. McNeal?

**MR. BAILEY:** Yes, Your Honor.

4

**THE COURT:** Mr. Davis, does the Government have any objections to any of the factual statements or factual information contained in the presentence report?

**MR. DAVIS:** No objections, per se, Your Honor. May I approach the --

**THE COURT:** Okay.

**MR. DAVIS:** There was an objection to -- that Mr. McNeal filed for the March 5th, 2020 buy. The Government is going to be conceding that. We did not have at the time, in the Government's opinion, enough to go on. And we don't believe we would have enough to make it by a preponderance of the evidence at this time.

**THE COURT:** Not even by a preponderance of the evidence?

**MR. DAVIS:** Correct. Correct, Your Honor.

**THE COURT:** And tell me again why the Government is conceding to that.

**MR. DAVIS:** Again, we didn't feel like we had enough evidence to go forward with it at the time, which is why we didn't ultimately charge it. And we -- at this time, we don't feel like there was -- theres' enough even to go by a preponderance of the evidence.

And looking at it, Your Honor, just for your knowledge, it doesn't change the guidelines at all. It will stay a 32 regardless.

**THE COURT:** Okay. Mr. Bailey, do you want to be heard on that in any way?

**MR. BAILEY:** No, Your Honor. Thank you.

**THE COURT:** All right. Well, obviously if the Government represents that it doesn't believe that it can provide sufficient evidence to prove by a preponderance of the evidence as far as sentencing that the transaction that allegedly occurred on March the 5th of 2020 should be attributed to Mr. McNeal, then the Court will not include it in the calculations.

Any other objections to any of the factual statements or factual information, Mr. Davis?

**MR. DAVIS:** No, Your Honor.

**THE COURT:** Mr. Bailey, any objections to any of the factual statements or factual information contained in the presentence report?

**MR. BAILEY:** Your Honor, all of my objections are similarly filed in my amended position paper.

There has been an extraordinary amount of back and forth in this case with me and Ms. Leanne Davidson from federal probation, also some officials in Kentucky from the Federal Public Defender's Office, who assisted me in how their office would look at Kentucky convictions, multiple times, multiple days, and with the United States Government prosecutors.

UNREDACTED TRANSCRIPT

I have reviewed and recently spoken with Ms. Leanne Davidson and I have reviewed and provided my clients a copy of the second addendum to the presentence report. And many of the arguments -- I'm going to say all this, Your Honor, to kind of set a tone and explanation so that Your Honor doesn't think that we ignored current law or -- and I don't think that my amended position paper gives that impression, because I reference them a lot, but Mr. McNeal is pretty adamant in how the Court should give a -- in two ways, how some of his older cases he does not believe should be counted.

When I looked at them, particularly starting with Paragraph 30 --

**THE COURT:** Well, it sounds like you're objecting more to the calculations.

**MR. BAILEY:** We're objecting to the calculations at this time.

**THE COURT:** Right.

What I'm asking at this point, do you have any objections to any of the factual statements or factual information?

**MR. BAILEY:** Oh, I'm sorry. Regarding the conduct and everything?

**THE COURT:** Right.

**MR. BAILEY:** No. I'm so sorry.

THE COURT: That's all right. That's all right, I just -- I want to be sure we keep it clear for the record.

MR. BAILEY: Okay.

THE COURT: All right, so there's no objections to the factual allegations as far as the offense conduct other than you had objected to the inclusion of the controlled buy that's referenced in Paragraph 6 --

MR. BAILEY: Correct, Your Honor.

THE COURT: -- of the presentence report, but the Government's conceded that it should not be included.

MR. BAILEY: Correct.

And I'll say for the record, make it clean, the way the factual allegations are in the presentence report are the way the trier of fact the jury had convicted Mr. McNeal. We're not arguing against how they were presented to us for sentencing.

THE COURT: All right. Well, let's go through the calculations and then I'll hear your objections, okay?

For the record, Mr. McNeal was found guilty of Count 1 and Count 2, distribution and possession with the intent to distribute more than 50 grams of actual methamphetamine, in violation of 21 U.S.C. 841(a)(1) and (b)(1)(A). That would carry a statutory sentence of not less than ten years of life imprisonment, up to a $10 million fine or both, from five years to life of supervised release, and a

sir....8$100 mandatory special assessment.

Looking at the calculations on Page 5 -- well, actually beginning at Paragraph 18. Are we going to have to recalculate that?

**PROBATION OFFICER:** Yes, sir.

**THE COURT:** All right. What would be the drug quantity as far as the meth?

**PROBATION OFFICER:** Your Honor, I have that he would be held responsible for 190.28 grams of methamphetamine actual.

**THE COURT:** All right. And then the converted?

**PROBATION OFFICER:** Since there's no secondary drug, Your Honor, his calculation would be based just on the meth actual weight, which would still be a Level 32.

**THE COURT:** Okay.

**PROBATION OFFICER:** So he will not be held responsible for the cocaine.

**THE COURT:** Because that was all part of that --

**PROBATION OFFICER:** That is part of Paragraph 6, yes, Your Honor.

**THE COURT:** Okay. So it's strictly the methamphetamine actual weight, and you said 190.38?

**PROBATION OFFICER:** 28, Your Honor.

**THE COURT:** Okay. All right. That results in an offense level, under sentencing guideline 2D1.1(a)(5) and

1111111111111111111111111

(c)(4), of 32.

There are no other enhancements until we get to Chapter 4, and that's where the report concludes that Mr. McNeal would qualify as a career offender under sentencing guideline 4B1.1(b)(1). Under that guideline, if a defendant is at least 18 years old at the time of the incident offense, the incident offense is a conviction of a felony that is either a crime of violence or a controlled substance offense and the defendant has at least two prior convictions of either a crime of violence or controlled substance offense, then they qualify as a career offender.

In this case, the referenced convictions, prior convictions are found at, according to my notes, Paragraph 30, 33, 34 and 35.

Now, Mr. Bailey, let's take up your objections. If you will, come to the podium and let's just take these one at a time and see if we can work our way through them.

I believe your first objection as far -- again, as far as the calculations are concerned and whether Mr. McNeal qualifies as a career offender, your first objection relates to the conviction found at Paragraph 30 --

**MR. BAILEY:** Yes, Your Honor.

**THE COURT:** -- which occurred in 2003, is actually when he was sentenced; is that correct?

**MR. BAILEY:** Yes, sir, Your Honor.

THE COURT: All right. And it's addressed -- well, it's actually addressed, I think, in the first addendum and the --

MR. BAILEY: It is.

THE COURT: -- second addendum.

All right, go ahead.

MR. BAILEY: In the first addendum, I'd like to go that direction first, address the addendum.

The Federal Probation states that they reached out to the Kentucky Department of Corrections and that the sentence in Fulton County Circuit, Docket Number 2002-CR-63, has not yet expired. So their position is that -- that he is -- even without any arguments or calculations essentially of his -- if I take a position of, well, jail credits apply, et cetera, that none of that matters because that sentence has not even yet expired.

And the problem that I ran into and had this discussion with Ms. Leanne Davidson, the federal probation officer on this matter, is, and she and I both agree, that they didn't seem to -- the State of Kentucky didn't seem to state with definitive position what an expiration of sentence was in their cases.

And so, we were left to the mercy of asking for the jail credit and trying to figure out how it applies and whether -- and determining ourselves whether or not it was

officially expired, a case -- well, just -- for argument's sake, just talking about Paragraph 30.

So when Mr. McNeal and I first started talking and I discussed this with him at length, he was -- he was particularly -- I'm trying to get back to my -- I had done some calculations, Your Honor. I'm trying to get to that.

**THE COURT:** Okay. Take your time.

**MR. BAILEY:** Okay.

Okay, I found it.

So my first thought, Your Honor, I said, well, I know what career offender is -- how "career offender" is defined and what we should be looking at, and I understand that there's the 15-year rule and that there needs to be -- that the incarceration can be during any part of the 15-year period.

When I had done the original calculations based on the reports from Kentucky Department of Corrections, if Your Honor would agree that jail credits, et cetera, applies -- and which is why you gave us part of this -- this reset today, so that I could do an investigation into that. The way I've come up with this, I didn't see anywhere that -- what Ms. Leanne Davidson came up with, that this case was still open. I have not received anything that suggests that myself.

**THE COURT:** But now, she's indicating that's what

was indicated to her by the Kentucky Department of Corrections.

**MR. BAILEY:** I understand that. And if that is the case, when -- when Mr. Aaron Davis and I of the Federal Probation Office in Kentucky -- I'm sorry, Federal Public Defender's Office in Kentucky did our research and made some calls over there together, that was not -- that wasn't relayed to me. That wasn't relayed to us. So this is -- this was new information for me.

**THE COURT:** Well, let me ask you, and I don't want to cut you off on anything you want to say, but even if we disregard that part of it --

**MR. BAILEY:** Yes, sir.

**THE COURT:** -- and we just talk about the 15-year calculations --

**MR. BAILEY:** Yes, sir.

**THE COURT:** -- does Mr. McNeal -- does Paragraph 30 and a conviction there not fall within 15 years?

**MR. BAILEY:** It does -- according to my original calculations, it does, Your Honor.

However, there's another way to look at it. Mr. McNeal takes the position, well, just like the penal farm here, Your Honor, at Shelby County, if you get a sentence over here, they apply all good time credit, work credit, everything on the back end of cases. That's what I've always

been told, but he was -- his position was, well, in Kentucky it's done differently. In Kentucky, they apply it on the front end of cases.

When I inquired into that, I was told differently than either. I was told that each month, they take a look at the credit earned and they apply it instantly as earned, okay?

That being the case, I'm not of the position to say that he has quite enough credit to get him under the 15-year mark. I -- or beyond. I can't say that with definitive position.

However, if I applied all of his -- what made me file the amended position paper was that he had that concurrent sentence in Paragraph 33. And I said, well -- and according to the federal public defender in Kentucky and according -- from what he was helping me discover, the -- I'm sorry, it's just so -- I just need a second. I'm trying to gather my thoughts.

**THE COURT:** That's fine.

**MR. BAILEY:** When -- you don't get credit for -- you don't get credit -- just like in Tennessee, you don't get credit for being on probation. Your expiration of sentence credit is given for parole, that's -- or -- yeah, that's what he told me, parole. In these cases, we're at 20 percent.

Now, absent the 20 percent, Your Honor, no, I

don't think -- if the 20 percent parole did not apply -- and he did go on parole on -- on the case in Paragraph 30.

THE COURT: Well, do you agree or disagree according to the -- I'm looking at the addendums. Do you agree or disagree that it appears that he went on parole on October the 2nd of 2018?

MR. BAILEY: No, I don't disagree.

THE COURT: You don't disagree?

MR. BAILEY: I do not disagree.

THE COURT: Well, even with all the credit that you're trying to see if you can apply, how would that get you below the 15 years? That's where I'm struggling to understand your argument.

MR. BAILEY: Okay. Let me articulate this way: If Your Honor looked at the case as a 20-percent sentence, even with his parole -- I know he violated probation, but even when he was -- even when he started serving his sentence again, if you included both cases, Paragraph 33 and 30, and you applied the -- I think it was like 2,000 something days, I put it in my position paper, of credit upon what would have been 20 percent of his sentence, then it would apply.

The problem is -- I know that's very unorthodox. I know that's very unorthodox. I know we've never done anything like that, but I couldn't not mention it based on what the Federal Probation Office in Kentucky told me how

they calculate expirations of sentences. I thought it was -- I had never heard of that myself, but that is what was relayed to me. So I wanted you to be able to have it before you to take a look.

THE COURT: And I appreciate your argument.

Do you have any legal authority to support --

MR. BAILEY: I do not, Your Honor.

THE COURT: -- the way you're suggesting the Court should maybe consider this?

MR. BAILEY: I do not, unfortunately.

The best I could do is my own investigation as an officer of the Court, and I don't have any legal authority as to how work credits, jail credits and everything should apply under the guidelines to help with career offender.

THE COURT: Okay. Anything else you would like to add?

MR. BAILEY: As for that, no, Your Honor. That paragraph, no, Your Honor.

THE COURT: All right. Mr. Davis, do you want to be heard?

MR. DAVIS: My argument would be better if -- it would be more efficient for me to argue after he's argued all of his.

THE COURT: Okay.

MR. DAVIS: Because mine will take everything

into account, Your Honor.

THE COURT: Okay. We'll do it that way.

Mr. Bailey, that -- does that conclude your argument sufficiently as it relates to calculation and the -- at least at this point, the inclusion of the conviction at Paragraph 30 --

MR. BAILEY: Yes, Your Honor.

THE COURT: -- as a qualifying offense under career offender?

MR. BAILEY: It does.

THE COURT: All right.

MR. BAILEY: And I will say as for the jail credit calculations, work credit, all the credits, that is the end of my argument for his position for that.

THE COURT: Okay.

MR. BAILEY: He wanted me to discuss as a matter of the rule of lenity or -- and for 3553 factors, which I can do later --

THE COURT: Okay.

MR. BAILEY: -- to get into the other paragraphs, and that's where the whole ex post facto argument comes up.

I know what the current law is, Your Honor. However, the spirit of the ex post facto, it kind of made sense what Mr. McNeal is saying. I could understand why he would think that. I'm not going to get heavily into that

now, but we will acknowledge that in November 2023, the guidelines were admitted and subsection -- to put aside all of the arguments by defendants about Havis applying, Subsection D of -- I've got it right here.

4B1.2(d) under -- and show it -- offenses included was implemented under the 2023 guidelines. And he would like -- if Your Honor doesn't agree with any arguments under the Miller versus Florida and how the United States Supreme Court thought as a matter of fairness, ex post facto should give him some relief, then we would like you to consider it under the 3553 factors just as a matter of lenity.

**THE COURT:** Okay. All right. Well, let's hold that for 3553.

**MR. BAILEY:** Yes, sir.

**THE COURT:** So that concludes your argument as far as the qualifying offenses for Mr. McNeal as a career offender?

**MR. BAILEY:** Yes, Your Honor.

**THE COURT:** Everything else would relate to guideline manual that should be utilized, ex post facto and those arguments.

**MR. BAILEY:** Yes, Your Honor.

And Your Honor, we recognize -- Mr. McNeal may disagree with me, but we recognize that there's been -- and I

explained this to him. There's a Havis and then there's a Havis 2, there was an en banc hearing and there were changes in that.

It's even argued now, I think it was United States versus Miller. I think that that's the current law. In fact, I think that Ms. Leanne Davidson quoted it in her addendum.

**THE COURT:** She did.

**MR. BAILEY:** Yeah, that -- and I did read that case. And so, my original discussion with him is correct, that Havis as to Tennessee law specifically does not apply.

However, if -- and this -- the way I explained it to Mr. McNeal, if Your Honor will consider -- if Your Honor considers any other application, especially with how the guidelines may affect him or the facts of his cases, the two -- the two cases that make him -- that would apply, two of the cases that would normally apply for Mr. McNeal and career offender, involve -- one involves him -- I think they're Paragraphs 34 -- yeah, Paragraphs 34 and Paragraphs 33 don't involve -- they're -- one is trafficking and -- Paragraph 34 is a trafficking controlled substance and the other one is possession of cocaine with intent to deliver. Neither involve the actual transaction.

And that being the case, Mr. McNeal's position is, well, had they not changed the law, Havis would apply. I

had to -- Havis would apply and that the intent would be -- it would be in violation of the spirit of what Havis was trying to do.

**THE COURT:** Well, but help me out here. As I read Havis, and you're correct, there have been subsequent cases that -- where the Courts have attempted to clarify, I guess, exactly what Havis stood for.

**MR. BAILEY:** Yes, sir, Your Honor.

**THE COURT:** As I read Havis, it involved attempt crimes. That's what Havis dealt with. Are you reading it differently than that?

**MR. BAILEY:** I read it that it involved attempt crimes, but that intent crimes should be looked at in the same light as attempt. That was the way I understood it.

**THE COURT:** Well, but that wasn't the holding in Havis. You agree? I mean, the Court specifically said this is a very narrow holding that --

**MR. BAILEY:** It did. Yes, sir.

**THE COURT:** This is a very narrow holding that we're reaching, and this case only involves attempt crimes. And you trial courts, that's what we're telling you you need to consider. Again, it was to clarify -- or at least attempt to clarify subsequently to that. But are we in agreement that the Havis case was a very narrow holding and it only applied to attempt crimes?

**MR. BAILEY:** That's correct.

**THE COURT:** Okay. I just want to be sure -- I want to give Mr. McNeal every benefit I can.

**MR. BAILEY:** And so do I, Your Honor. And I know this is a bit of a cacophony of law and interpretation. And normally, I wouldn't present it that way, but the -- there are some arguments that he made in terms of -- but I think they more apply to 3553 factors, and I told that to Mr. McNeal.

**THE COURT:** Let's save those until we get to 35- -- is there anything else as far as the actual calculations or qualifying offenses that you haven't either already addressed or haven't had an opportunity to address?

**MR. BAILEY:** No, Your Honor.

**THE COURT:** All right.

**MR. BAILEY:** No. The remainder of our argument would revolve around whether or not you, first of all, would accept the interpretation of Havis as applying to Mr. McNeal's past cases.

And if you set aside any -- the changes in the law and -- essentially ex post facto would be a matter of unfairness to Mr. McNeal. And that being -- I know that that's a long stretch. I'm aware of that. But Mr. McNeal wants you to consider every possibility because of the power and authority you have under Rita and under Booker.

**THE COURT:** Okay.

All right, let me hear from the Government --

**MR. BAILEY:** Yes, sir.

**THE COURT:** -- regarding the Government's position on the qualifying offenses, and then I'll rule on that and then we'll go into other areas.

**MR. DAVIS:** Yes, Your Honor. Just kind of addressing, just so there's clarity in my response.

Reading the Defendant's objections, I took it that there were essentially two main objections to the individual paragraphs; the first one being that it was not within the 15 years and then the second one being that it didn't qualify as a controlled substance offense.

Am I on the right track there?

**THE COURT:** That appears to be the argument. Yes.

**MR. DAVIS:** Okay. That's -- that was the take I got from it, and I -- that's how I'll be addressing it.

Specifically, if you look at Paragraph 30, Your Honor, and 34, those are going to be the Kentucky convictions. Yeah, 30 and 34. The Government's contention is that those both are countable within the 15 years and that they are controlled substance offenses.

It's United States v. Henderson, United States v. Steward. I've got the cite for United States v. Henderson.

It's 2023 WL 6840982. And then Steward is going to be 2021 US app Lexis 9864. And they both stand for the proposition that trafficking controlled substances and then also the trafficking in a controlled substance second or greater offense, those are both controlled substance offenses. The only difference between the two is the amount of drugs that are involved. And also, the -- when they're actually charged.

I believe the PSR might have it labeled wrong. The second, it would be second degree, not second or greater offense. And again, that goes to how many prior convictions they have and then also the amount of drugs that are involved.

It's the Government's contention that both of those convictions actually count for purposes of controlled substance offenses for career offender. But even if you were to throw those out, which the Government's not conceding that, we still would be able to rely on Paragraph 33 and Paragraph 35. Those are possession of cocaine with intent to sell or deliver. And again, possession of cocaine with intent to deliver for 33.

Both of those, while they were -- actually, he was sentenced on the same day, July 3rd of 2008. There was an intervening arrest between both of them and they are equally countable. So again, we would argue that we have

more than enough under that for the career offender status, Your Honor.

THE COURT: All right. Thank you.

All right. Mr. Bailey, anything else you want to add as far as the qualifying offenses?

MR. BAILEY: No, Your Honor.

THE COURT: All right. Well, this can be challenging sometimes to try to be sure that we count what we should and don't count what we shouldn't based on the current state of authority, and that's what we're talking about today.

So we -- as I mentioned earlier, to qualify as a career offender, we're talking about at least two prior convictions that qualify as either a crime of violence or a controlled substance offense.

In Mr. McNeal's case, there are actually four that the Court would have to consider; the first one is at Paragraph 30, trafficking in a controlled substance. He was charged back in 2002, convicted in 2003, and his probation was revoked in 2004. And the original sentence of five years and six months custody was imposed. That was in 2004.

The second qualifying offense, Paragraph 33, charged in 2004, convicted in 2008 of possession of cocaine with intent to deliver, and that was out of Weakley County Circuit Court here in Tennessee.

The next one, Paragraph 34, charged in 2007, convicted in 2008, trafficking in a controlled substance, second offense, and he received a sentence in that case of 15 years custody. It says consecutive to a conviction out of Kentucky.

And then finally, we have Paragraph 35, charged in 2008, convicted in 2008, possession of cocaine with intent to sell or deliver. And in that case, another eight-year sentence. That was to run concurrent -- according to the PSR, to run concurrent with the Kentucky sentence, which would be the one, I'm assuming, back in Paragraph 33.

But the question is, do these qualify, one, as controlled substance offenses, and do they fall within the 15-year lookback that we basically use from the time when Mr. McNeal in this case was convicted of the offenses that are contained in the presentence report and the offenses that he was actually found guilty of and then looking back?

Based on the explanation contained in the first addendum and the second addendum, the Court finds that all four of these would qualify Mr. McNeal as a career offender. It's the Court's opinion that all four of these convictions do qualify under the guidelines as controlled substance offenses. Again, the first one, just for clarity, trafficking in a controlled substance; the second one, possession of cocaine with intent to deliver; the third one,

again, trafficking in a controlled substance, second offense; and then finally, possession of cocaine with intent to sell or deliver.

I am bound to apply existing authority to these cases, and I just haven't been able to come in agreement with the arguments that Mr. McNeal and/or Mr. Bailey are making. It appears that both sides or all sides -- I think Probation has done a very good job of trying to clarify the position that Probation is taking that these positions do qualify.

I understand some of what Mr. Bailey is articulating as far as an end date, but I don't think that really is going to make a difference in this case. That -- the end date is not really what I am focused on. It would be the looking back and the 15 years.

And according to the information in the addendum and the second addendum, when we're talking about especially Paragraph 30, that was the one that seemed to be giving the most confusion or the hardest one to actually calculate when that sentence would have expired or when he would have been paroled.

And this -- I'm looking at the second addendum now, but according to the presentence report, second addendum, that would have only been October the 2nd of 2018. And so, if I take that date, obviously then talking about the current convictions, which occurred in 2020, March, basically

that's when the report alleges and the jury found that Mr. McNeal was engaged in the distribution of narcotics occurred in 2020.

So at any rate, I hope that explains it fully.

Mr. Bailey, is there anything else you want me to put on the record just for future reference? Is there anything I failed to include that you think we need to include?

**MR. BAILEY:** No, Your Honor. We understand. Appreciate your indulgence in not just the reset today but, you know, hearing us out.

And again, I understand that the positions we're taking may have been unorthodox, but we thought that considering the wide latitude you have under Rita and Booker, it was a good opportunity for you to also consider those things. Plus, it preps you, Your Honor, for the 3553 factors arguments that we may make.

**THE COURT:** Well, obviously I do have some discretion, but by the same token, I'm bound to follow existing authority as far as how these are looked at. And I know you understand that.

I always appreciate when counsel come in and try to make an argument that they believe at least has some support in the law and fact. I think that's appropriate, and I think that just indicates that counsel is doing a thorough

job and trying the best they can to represent their client, but sometimes -- and it's unfortunate sometimes, but it's just that the law and the circumstances work against you. That's the only way I know how to say it.

That -- and that's what the Court ultimately has to decide, what is the state of the law and how it should be applied in any given case. And in Mr. McNeal's, it's just -- for him, it's unfortunate, I suppose, that his history is working really hard against him in the sense that these other convictions count under the guidelines -- or at least in the Court's opinion, they count under the guidelines as qualifying offenses.

And once that occurs, then Congress has determined that he would fall in this category of career offenders. And certainly, that changes the equation pretty drastically at that point when someone qualifies as a career offender.

All right. Let's see. Mr. Davis, I think I asked, do you have any objections to any of the calculations stated by the Court?

**MR. DAVIS:** No, Your Honor.

**THE COURT:** All right.

All right, let's now move into 3553 factors. Does either side wish to call any witnesses?

**MR. DAVIS:** I do not, Your Honor.

**THE COURT:** Mr. Bailey, do you wish to call any witnesses?

**MR. BAILEY:** I don't, Your Honor, but we'd like to bring attention to the letters of support that have been filed and the certificates of completion by Mr. McNeal.

Particularly, the letters that stood out are from the Shelby County Divisions of Corrections with Mr. Terrance Robinson, who's an official there. He wrote a nice letter on behalf of Mr. McNeal and how he completed his victim impact and anger management.

Lieutenant Blair -- I'm sorry, Brian Chambers, the unit manager where Mr. McNeal was housed, and he talked about how he displayed an exceptional level of maturity.

Lieutenant Joshua Williams, the assistant watch commander at the Shelby County Division of Corrections, who also worked with Mr. McNeal, supervising him for a year, and found him to have a lot of positive qualities. I think they talked about even him taking the lead and availing himself and volunteering to do custodial work, et cetera.

Sergeant -- I think I mentioned Sergeant Blair already, but if I didn't, Sergeant Blair and Officer Savage wrote a letter on his behalf, as well, saying he had a positive attitude. He was eagerly helpful, cheerful, respectful day in and day out.

And Officer Derrick Berry, I think that's the

last one, Your Honor.

Actually, there's one more, Officer Augustus.

So all of those officers got together and officials and lieutenants and took the time out of their day just to write some letters on behalf of Mr. McNeal. And I just wanted the Court to -- and not to mention his family members and his pastor, who I think also appeared last time he was here. So we would ask that the Court just recognize Mr. McNeal's character has been boosted in that way.

THE COURT: Yeah, the -- all the letters -- and I've read -- just for the record, I've read all the letters that were submitted. They were filed at Docket Entry Number 67, and there are a number of letters, primarily from correctional officers at the facility where Mr. McNeal has been detained, very strong letters of support for him, as well as some other letters from family members and friends. So I do have those and I have read each -- each one of those letters.

All right. Let's go back to where we were as far as the calculations. Having found that Mr. McNeal would qualify as a career offender, that elevates him to an offense level of a 37.

MR. BAILEY: Your Honor, I'm so sorry to interrupt you. Was I supposed to begin an argument on 3553 factors after I mentioned those?

**THE COURT:** Well, I'm going to let you do that. Let me finish the calculations first.

**MR. BAILEY:** Okay. Okay. Thank you.

**THE COURT:** Then we'll hear from you on 3553.

Base offense level of 37. There's no credit for acceptance of responsibility, as is indicated in the report. So Mr. McNeal would have a total offense level of a 37.

His criminal history is found beginning at the bottom of Page 11, Paragraph 39. He has 21 criminal history points. That would place him in criminal history category of VI. And also under sentencing guideline 4B1.1(b), since he's qualified, the Court has found he qualifies as a career offender, then that would also place him in criminal history category VI.

With an offense level of 37, criminal history category of VI, the guideline range of imprisonment would be 360 months to life imprisonment as to each count, five years of supervised release as to each count, a fine range of $40,000 up to $20 million, and a $200 mandatory special assessment.

Now, Mr. Davis, any objections to any of the calculations reviewed by the Court?

**MR. DAVIS:** No, Your Honor.

**THE COURT:** Mr. Bailey, any other objections to any of the calculations reviewed by the Court?

**MR. BAILEY:** No, Your Honor.

**THE COURT:** All right. Now let's go to 3553.

Mr. Davis, let me hear from the Government first regarding what you believe would be an appropriate sentence for Mr. McNeal.

**MR. DAVIS:** Yes, Your Honor.

The Government's contention is that a guideline sentence at the low end of the range, the 360 months on each count concurrent to each other with five years of supervised release also concurrent, then the $200 mandatory special assessment, that that would be adequate in this case.

Particularly looking at the 3553 factors, nature and circumstances of the offense, these were -- this is a pretty serious offense. We had two instances where Mr. McNeal was dealing in a lot of methamphetamine, which I don't have to tell you, I've been before you many, many times, that is a substance that has just plagued western Tennessee. And he was dealing in a lot of that substance.

The history and characteristics of the Defendant, he has an education and seemingly can work, but instead chose to deal in methamphetamine. I do know that based off of his interview in the PSR, that he had stated that he was under the influence or at least addicted to methamphetamine at the time that he was dealing, but the amount of substances that he was dealing in was way more than what would have been for

personal use of someone.

The need for the sentence imposed to reflect the seriousness of the offense, a sentence of 360 months certainly would do that. It would also promote respect for the law and just punishment for the offense. And lastly, it would prevent there being any sentencing disparities between likely-situated defendants who have been convicted of the exact, same thing.

So as such, the Government would ask that a sentence of 360 months with five years supervised release be the sentence of the Court.

Thank you.

**THE COURT:** All right. Thank you.

Mr. Bailey.

**MR. BAILEY:** Your Honor, I would argue that what is a lot in drugs is relative to a lot of factors, including the region and the circumstances of the offense. Just thinking about what the Government just said about a lot of meth, he was dealing in a lot of methamphetamine, I would argue that relatively, that the amount of substance that was found, I might argue against that.

But for the purposes of Mr. McNeal's benefit and for his family and friends that are here today, I would like to discuss the 3553 factors that you're going to review briefly. I always try to do that just to remind them what

you're considering in this phase of sentencing.

**THE COURT:** Okay.

**MR. BAILEY:** The factors to be imposed in his sentence are several, and they include the nature and circumstances of the offense and the history and characteristics of the Defendant, the need for the sentence to be imposed. And that need would be based on several things, that it reflect the seriousness of the offense, it promotes respect for the law, provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the Defendant and to provide the Defendant with needed educational and vocational training, medical care and other correctional treatment in the most effective manner. Those are the primary bases of 3553 factors.

And I would like to present to Your Honor several things that I've thought about. I was looking back at particularly the substance abuse part. I mean, I made some arguments in my amended sentencing and my original sentencing position papers, but Paragraphs 65, 64, not so much Paragraph 66, but I would like to mention that one, too.

Going back to when he was age of 12, Mr. McNeal has been desensitized to the ills of drug usage and drug dealing. He has a history of alcohol, marijuana, cocaine, ectasy going back to the age of 12, not even a teenager yet,

and used alcohol, abused alcohol all the way up until he was arrested in this case.

And from ages 12 to 14, he used cocaine. And I think even at trial, I may have -- I think I mentioned that he was a cocaine user, that there were some arguments about that. And Ms. Blair, who was the confidential informant in this case, who testified at his trial, was one of the people who did cocaine and crack with him, which is one of the reasons he was targeted in this case. One of the reasons he got here was because of his long usage and abuse of drugs and particularly cocaine and crack all the way up to his adulthood. He knew Ms. Blair real well.

And Mr. McNeal's position is, he had just started selling the substance that he was caught with here today, meth, but that his history and his usage and the only drugs he had ever sold and used prior to this were dealing with cocaine and cocaine base.

That being said, I want to bring Your Honor's attention -- I said that I would go back to his prior offenses, the -- Paragraphs 33 and 34, Paragraph 33 being possession of cocaine with intent to deliver in Weakley County.

That charge was -- it states May 2nd, 2004. He was 24 years old. And the facts of that case involve an officer making contact with him when he was in the parking

lot and that he was arrested with a bag of 5.5 grams of crack cocaine.

And so, the presumption, Your Honor, is that it's an intent to sell, manufacturer or deliver in Tennessee law in the same trafficking controlled substance in Paragraph 34, which was a November 30th, 2007 case.

And again, he was observed fleeing from the residence, and law officials chased him, gave verbal commands for him to stop. He foot chased, and they found 3.7 grams of cocaine and a cellular phone. There was some rifle rounds but no rifle found, but anyway, this wasn't a confidential informant sale or a buy by the undercover agents or anything like this.

I'm not negating the State's right, whether that be the State of Kentucky or the State of Tennessee, to make the presumption of intent to sell or traffic. However, where it doesn't make the distinction on that presumption is Mr. McNeal's long-established history of usage.

I once heard a friend of mine that works for Merrill Lynch said, if you want to own a boat, don't buy a boat, invest in a boat company, you know.

And that being the case, Mr. McNeal used the same substances he was found with. And it's -- I want this -- I want the Court to consider that we don't know how much of these drugs there was an intent to sell. Maybe 0.7 grams was

intent to sell in Kentucky, but there was an intent to sell and 3 was for personal use. We don't have a way of acknowledging or distinguishing that he would have sold part of this or used the other part, because we know he used.

And I think it would be silly for us to presume that a long-term drug addict at age 27, who's been abusing this stuff since he was 12, would not have been using part of that dope. Mr. McNeal has been very straightforward with me about his drug usage. He told me all about the history of Ms. Blair, who testified in this trial. In fact, I think he knew one of the officers who testified here because of that small community.

Well, that being said, Your Honor, I'm asking that you would consider -- I know that Mr. McNeal is being established as a career offender under the guidelines. We realize that, but we're -- what I would ask, Your Honor, is looking at the 3553 factors, looking at the -- to reflect the seriousness of the offense, we know that selling meth is a serious offense, Your Honor.

Promoting respect for the law, providing just punishment for the offense. Well, the question is, what is just punishment? This is not a mandatory minimum, it's my understanding, that you have to apply, Your Honor. And I think 360 months to life is quite extraordinary considering the instant -- the facts of the instant crime of this that's

before you today.

And even really considering with the exception of that one, I think it was Paragraph 35, his most serious violent offense, it's excessive. And to afford adequate deterrence from criminal conduct, Your Honor, I would ask that you consider giving him a substantial reduction of time. 180 months or 15 years, 20 years, that in itself at his age will put him at 55, 60 years old before he would even be released. To protect further crimes from the Defendant, 15, 20 years is plenty of time to give adequate deterrence or protect the community from further crimes of Mr. McNeal. And to provide him with educational, vocational training and medical care.

Now, it's easy for a defense attorney to get up here and say, oh, Your Honor, just take it easy on him. But I am asking you to seriously consider the arguments that I made under the 3553 factors and considering those -- two of those qualifying cases, coupled with how he was brought up and his serious drug abuse.

I would argue, Your Honor, that we've been -- you and I have seen each other over many years in a lot of cases, and this is probably one of the more unorthodox cases I've argued for in sentencing. But I think it is the earliest drug abuse I've ever seen on a presentence report, at age 12. Usually I get them 14, 15. But at age 12, he was hitting the

UNREDACTED TRANSCRIPT

hard stuff way back then. And for us to think that that would not impact his future -- and he even still tried to go to college. I was pretty astonished when I saw that in the presentence report.

But even considering all that, Your Honor, I'm asking, is it really necessary even considering a career offender position, that he would need to do 30 years or more, 30 years to life, 360 months? I don't think so, Judge, and I mean that sincerely.

At his age, by the time he gets out, all of the -- even if you shaved off ten years of that, Judge, all of those factors under 3553 will be satisfied. So we ask that you give him as much of that consideration as possible.

He's made -- although he was incarcerated when he did it, all of the jail credits he did, the work, the letters, his attitude in jail, all the things that the lieutenants and sergeants and everybody said about him, when he's ready to make the effort, he makes the effort, but that drug calls him. That alcohol and those drugs are -- that's a heavy burden, a monkey he can't get off his back.

I'm not saying that's an excuse. Of course I'm not saying that. We know that. But at some point, I think in the judiciary branch, we can take it upon ourselves to consider that, when I was talking about leniency earlier today, Your Honor, and how I thought we should look at his

past crimes in light of the 3553 factors, when we're used to looking at them in the opposite way. We usually argue why he should get worse, but I'm seeing in a different perspective, Judge.

And I think that I stand on what I said, Your Honor. I'm not going to keep talking all day, but I would ask that you consider giving him a considerable variance.

Thank you.

**THE COURT:** All right, thank you.

Mr. McNeal, would you like to make any statements? You don't have to say anything at all if you don't choose to, but if you would like to make a statement, just keep your seat and speak directly into that microphone.

**THE DEFENDANT:** Yes, sir. My name Darryl McNeal. I'm 44 years old.

First, I want to start off by apologizing to the Courts, to my family, especially my kids, for continuing to put them in this type of situation.

I've been indulging in this life for a very long time. I get high. I sold some drugs to maintain my -- I know you've got that paper in front of you, but I'm not that person and I ain't been that person for a while now.

I got out of that -- I stopped using drugs and selling drugs around about September -- September, October 2020. I dedicated by keeping myself busy by working

two jobs. Kept coming up with the youth program for my community, which my 11-year-old was a part of at the time. Volunteering coaching and worked so hard that I ended up getting my own tire business.

For the time I was picked up, I was close to two years clean. I can't change from what I've done in the past. And I thought I had that life behind me, but I didn't stop there. I continued to keep going, taking classes, working hard when I got opportunity to work at the facility I'm in. I also continue to remain contact with my family and my kids.

I'm just asking for mercy. See that I'm very remorseful. I'm asking for an opportunity to be able to get back out there so I can be a real father to my kids and -- because I robbed them for a lot of years from that. And I hope they -- y'all forgive me and I hope the -- my kids forgive me.

**THE COURT:** All right. Thank you, Mr. McNeal.

Anything else from the Government?

**MR. DAVIS:** No, Your Honor.

**THE COURT:** All right. Mr. McNeal, you heard Mr. Bailey go over it and your family heard, as well -- I'm assuming this is all your family -- earlier about what I'm required to consider in deciding your sentence. We refer to it as Section 3553, and that's the list of items that Mr. Bailey read into the record earlier. So I will be

UNREDACTED TRANSCRIPT

considering -- we call those factors, and I will be considering all those factors in deciding what I believe is appropriate in your case today.

I adopt the presentence report as the factual findings of the Court in Mr. McNeal's matter. To briefly summarize some of the information, I'm not going to go over obviously everything, but I am going to highlight some of the information.

The report indicates that beginning back in March of 2020, the law enforcement with the 27th Judicial District Drug Task Force in South Fulton as well as the Tennessee Bureau of Investigation began an investigation into the distribution of narcotics in the Western District of Tennessee. At one point, Mr. McNeal was identified. It was believed that he was possessing and distributing methamphetamine. The report goes on.

The Government has conceded this morning your first controlled buy actually, according to the report, occurred on March the 5th, 2020, but we're not including that in the calculations today. Second buy occurred on March 10th of that same year and then on March the 13th of that year.

The quantity, I went over earlier, as far as the drug quantity that the Court uses. And of course, that's how we arrived at what we call the base offense level, is based on the type and quantity of drugs that are attributable or

that the Defendant is responsible for.

Because of that, Mr. McNeal would have an offense level of 32, but then the Court has found that he does qualify as a career offender based upon his past history. It appears to the Court and the Court has found that he has four qualifying prior offenses. And as I've stated earlier, Mr. McNeal, that just shoots you up the ladder as far as the range that the Court's instructed to consider.

Now, I don't have to sentence you within that range, but we have these sentencing guidelines. The whole purpose of the sentencing guidelines is that, in theory at least, people who commit the same kinds of offenses and have the same kinds of history and these kind of things, that it would be appropriate to sentence them within the same range of periods of incarceration.

So that's why we have these sentencing guidelines. I'm not obligated to sentence you within that range, but I am instructed by law to at least consider those guidelines. And if the Court decides that they are appropriate in your case, then a sentence within the guideline range would be appropriate.

If for some reason the Court thinks that they are excessive in your case, then I can what we call grade downward if I believe that's appropriate.

But in looking at your case, the biggest concern

is just how long your convictions go back. We've gone over this already in some great detail, but we go back over 20 years, and there's been a repeated pattern of drug distribution going back to 2003, his first conviction. In that case, according -- and there's limited information here, but according to the report, you sold cocaine while you were in the presence -- this says while in the presence of children.

The next conviction that qualifies, 2008, as Mr. Bailey correctly pointed out, the quantity was 5.5 grams of crack cocaine. However, $1,135 was also found in the vehicle. And of course, that is an indication when we are looking at is someone possessing just for their own use or are they distributing, one of the other considerations is if there's a large quantity of currency. And in this case, the quantity was 5.5 grams, but there was a large amount of currency that was located.

Likewise, at the conviction at Paragraph 34. Again, as Mr. Bailey correctly pointed out, there was only 3.7 grams of cocaine, but that was the search of a residence. And inside the residence was located a 7.62 rifle and $6,000 in currency. So again, we've got another situation where the quantity of narcotics is not extremely high, but then you have a substantial amount of currency, which, again, is another factor that indicates someone is engaged in selling

narcotics.

And then finally --

**MR. BAILEY:** Your Honor, I think you said there was a rifle, but it looks like there were rifle rounds, just the bullets, but I just wanted --

**THE COURT:** Rifle rounds, okay. That's correct, rifle round, not a rifle but a rifle round.

And then in Paragraph 35, we have possession of cocaine with intent to sell, going back again to 2008. In that case, approximately 20 grams of cocaine, crack cocaine was located and then $721 in currency.

So we have this pattern of conduct, and it's unfortunate because for someone like Mr. McNeal, if he gets caught again, as he did in this case with the methamphetamine, then he qualifies as what Congress has termed a career offender. And once he qualifies as a career offender, the recommended range of imprisonment goes up considerably. And that's the unfortunate part of this, but that's the law. And I'm obviously bound to apply the law to the best of my ability.

In looking at his background, he was born in 1980, it says, in Union City, Tennessee. He says that growing up, all his needs were met and that he was not subjected to abuse. He states that his parents worked all the time, that his parents struggled financially from time to

time.  And then he goes on to state that he chose the street life.

And when asked, I guess, basically why did you choose the street life, he stated, "The hustlers became my role models because I didn't want to worry about the water being cut off."

So basically -- and it makes sense.  You know, it -- apparently at that time, Mr. McNeal looked at the world and said, I don't want to have to struggle and work as hard as my parents have and the street life seemed to offer an alternative way of living.

But unfortunately, the street life, based on what I've gone over, by law is illegal.  And so, when you lead that life and you continue to get conviction after conviction after conviction, then you end up in the situation where Mr. McNeal is today.

**MR. BAILEY:**  May I interject one thing, Judge?

**THE COURT:**  All right.

**MR. BAILEY:**  I'm sorry, I'll make it quick.

I just wanted to bring notice about -- since we're in the paragraph about his history and his physical condition, about when he -- the -- when he started picking up the cases going back to 2002, 2003, is right when we got severely burned, lost hearing, had to get the skin grafts, and --

**THE COURT:** Yeah, I'm going to address that.

**MR. BAILEY:** And with his -- coupled with his drug addiction, that played some part for him.

**THE COURT:** I'm going to address all that.

**MR. BAILEY:** Thank you.

**THE COURT:** As far as his family, he has -- according to the report, he has one child that's age 11, Darryl, and then he has two other children from a previous relationship according to the report.

As far as his physical condition -- and this is what Mr. Bailey was just referring to -- in 2002, there was a -- basically an explosion, it appears to the Court, where a natural gas leak inside of a house resulted in an explosion. As a result of that, Mr. McNeal sustained severe injuries. He sustained injuries to his neck, to his waist, to his front and back sides of his body. He was hospitalized for an extended period of time in Kentucky, it appears. And as a result of the injuries that he sustained at that time, he sustained nerve damage to his right arm. And he also indicates that it affected his hearing.

He's also been diagnosed with gout, with high blood pressure. He states that he was supposed to see a heart specialist during the time that he's been incarcerated at Shelby County and that he's been hospitalized on at least one occasion. He states that a heart cath was scheduled.

Has that taken place yet, Mr. McNeal?

**THE DEFENDANT:** I went a couple weeks ago to do a followup, and they supposed to be setting me another schedule.

**THE COURT:** Okay. With a cardiologist or someone like that?

**THE DEFENDANT:** Yes, sir, at Regional One.

**THE COURT:** Okay. In addition to the other conditions that I've just gone over, Mr. McNeal believes that he possibly has kidney failure issues, and that's something that is going to have to be monitored very closely in the future.

He states that he's prescribed six blood pressure medications, medications for gout and then for what's referred to as acid reflux.

As far as his mental health, he's never been diagnosed with a mental health condition, but he states that it's possible that he has experienced some panic attacks during the time that he's been incarcerated.

As far as substance abuse, the report mentions alcohol, marijuana, cocaine, and ectasy.

Now, Mr. Bailey is correct, according to this report, it appears that Mr. McNeal began to use cocaine somewhere between the ages of 12 and 14. Mr. Bailey made the statement that that is unusual.

Unfortunately, Mr. Bailey, from where I sit, it's not unusual. That's one of the things that I see over and over and over again where someone sitting where Mr. McNeal is, they unfortunately began to use substances early in life. I literally had a gentleman the other day who started when he was eight years old. And so, that may be the youngest I've seen so far. But unfortunately, between the early teen years, drug use becomes a way of life for some people. And of course, as they get older, it just seems to accelerate and they continue to use and they expand the type of substances that they are using.

He states, and he's restated this again today, that he's been drug free since August of 2020. He states that he did receive substance abuse treatment on two occasions when he was incarcerated and that he resided in a halfway house in Bowling Green, Kentucky for roughly six months.

Education, this is one thing Mr. Bailey pointed out is somewhat unique for someone in Mr. McNeal's situation. He attended what's called the Earle C. Clements Job Corps Center in Morganfield and obtained his GED in 1997. After that, he attended various institutions, the ITT Technical Institute in Indiana. Let's see, DeVry University in Georgia, it looks like. And then Jefferson Community and Technical College in Louisville, Kentucky where he was

UNREDACTED TRANSCRIPT

pursuing a degree in chemical engineering, which is very impressive that he was trying to advance his education and trying to better himself, but the drugs got in the way, I guess is the only way I know to say it.

It does mention that he has completed certifications in anger management and victim impact, and I do have those as part of the records that Mr. Bailey submitted.

As far as his employment, not a lot of information in the report. The Court indicates that he was employed at Tyson Foods for a period of time; what's referred to as East Main Street Motors in Union City, Tennessee; and then D&M New and Used Tires in Union City, Tennessee.

Considering the information that's available in the report, Mr. McNeal, at the advice of counsel, did not sign a tax disclosure form, so I don't have much information in that regard. But overall, it does not appear that Mr. McNeal would be in a position to pay a fine in this matter.

So that's what brings Mr. McNeal before the Court.

When I consider the 3553 factors, Mr. McNeal, they -- quite frankly, they almost all point to a within guideline sentence. We talked about the seriousness of the offense. You're selling methamphetamine, which is -- as Mr. Davis pointed out, in the Western District of Tennessee, we

have a big problem. Meth is causing destruction throughout the state. In the Western District of Tennessee, meth and now Fentanyl, those are two of the worst drugs that we're dealing with, but we're dealing with them on a big basis. It's occurring over and over again. And methamphetamine just destroys people and it destroys families. There's just no other way to look at it.

Now, your prior history had to do more with cocaine or with cocaine or a cocaine base. Unfortunately, in this case, you're dealing with meth. So seriousness of the offense, this is a very serious offense.

Your history and characteristics, on the one hand, that's the only place I can really see that maybe I could give you some leniency. Your history is bad as far as your prior convictions. You have a series of prior convictions that qualify you as a career offender, but you also have some positive things in the sense that you were trying to pursue your education, it appears. And based on the turnout today, it appears that you have family support. You have children.

You have some work history. And you state that you came clean about a year before you were actually charged in this case, and I don't have anything that indicates that's not correct, but it's just very concerning as far as your history and characteristics that you have the repeated

convictions that I've already gone over.

There is a need to deter criminal conduct. There is a need to promote respect for the law. As far as any future convictions, based upon the sentencing guidelines, the length that's referred to in the sentencing guidelines and your current age, I would like to think that you will not reoffend in the future. I hope you've learned your lesson, but I have no way of knowing that. That's just something that we never know. Some people change their ways early in life and some people later in life and they're still engaging in the same kind of activity that got them in trouble to start with, so I have no way of knowing how that will turn out.

Beyond that, there is really not much else that I can identify that would justify a variance in this case. Considering everything that I've just gone over, I am going to sentence Mr. McNeal as follows:

I'm going to sentence him to 300 months of incarceration. That will be followed by five years of supervised release. During the time that he's on supervised release, the following conditions will apply:

He shall participate in alcohol and/or drug testing and treatment as directed by his probation officer. He shall participate in mental health treatment as directed by his probation officer. He shall participate in moral

reconation therapy or other similar and approved cognitive behavioral therapy programs as directed by his probation officer. And he shall be required to submit his person, property, house, residence, vehicle, papers, computers, any other electronic communication or data storage devices or any media or any office to a search to be conducted by a United States probation officer.

Any failure on his part to submit to a search may be grounds for revocation of his release. He shall be required to warn other occupants that the premises where he's located and/or resides may be subject to search pursuant to this condition. Any search must be conducted at a reasonable time and in a reasonable manner and based on a reasonable suspicion that Mr. McNeal has violated a condition of his supervision and that the areas to be searched contain evidence of any such violation.

No fine. I don't have any information to indicate that Mr. McNeal could pay the fine.

**MR. BAILEY:** Thank you, Your Honor.

**THE COURT:** There will be a $200 mandatory special assessment.

Now, as far as his period of incarceration, I assume, Mr. Bailey, that you want me to recommend RDAP?

**MR. BAILEY:** Absolutely. Thank you.

**THE COURT:** Mr. McNeal, do you know what we mean

by RDAP? Do you know what that is?

**THE DEFENDANT:** A drug class?

**THE COURT:** Well, it's an intensive drug treatment program. And the people that get in it and complete it, from what I'm finding out, have been much more successful in not getting back into the drug habit.

I mean, you -- it appears to me that you probably have an addiction and you've been dealing with this addiction most of your life. So if there's something you can do while you're incarcerated that would help you so that when you're released, you don't go back to using drugs and maybe getting involved in distributing drugs, then that would be a really good thing.

So I'm going to recommend you for this program for RDAP. You have to sign up for the program. There's a long waiting list, so I would encourage you to sign up for it as soon as you can and try to get in the program.

Mr. Bailey, do you want local placement?

**MR. BAILEY:** Yes, Your Honor.

**THE COURT:** I'll recommend that Mr. McNeal be housed in a facility as close to west Tennessee as possible so that he can maintain contact with his family and children.

**MR. BAILEY:** I misspoke.

**THE COURT:** Do you have a request, Mr. Bailey?

**MR. BAILEY:** Yes, Your Honor. I misspoke. The

recommendation request would be for closest to western Kentucky.

THE COURT: Western Kentucky?

MR. BAILEY: Yes, sir, Your Honor.

THE COURT: Okay.

MR. BAILEY: Thank you.

THE COURT: All right. Let's change that to that he be housed in a facility as close to western Kentucky as possible.

Any other requests?

MR. BAILEY: No, Your Honor. Thank you.

THE COURT: All right. Anything else from the Government?

MR. DAVIS: No, Your Honor.

THE COURT: No counts need to be dismissed?

MR. DAVIS: No, Your Honor.

THE COURT: All right. Let's see. Mr. McNeal, one other final thing. If you believe that the sentence that I imposed today, that I incorrectly sentenced you or I've committed some kind of error, you have an automatic right to appeal the sentence to a higher court and ask that Court to review what's happened here.

But you need to know you only have 14 days from today for what we call a notice of appeal to be filed. If that notice of appeal is not filed within 14 days from today,

you would forever lose your right to appeal the sentence or any portion of the sentence that I've imposed.

Do you understand?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** So if you want to appeal, then you need to let Mr. Bailey know, but be sure -- that 14-day window is very strict. If you miss that 14-day window, then you lose a lot of rights. So let Mr. Bailey know exactly what you want him to do, okay?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Do you understand?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Okay.

All right. Mr. Davis, any objections to the sentence imposed or the method utilized by the Court in arriving at its calculations?

**MR. DAVIS:** No, Your Honor.

**THE COURT:** Mr. Bailey, I know you have interposed some objections. Any other objections to the sentence imposed or the method used by the Court in arriving at its calculations?

**MR. BAILEY:** No, Your Honor. And thank you for the variance.

**THE COURT:** All right. Good luck, Mr. McNeal.

(Adjournment.)

UNREDACTED TRANSCRIPT

**C E R T I F I C A T E**

I, CANDACE S. COVEY, do hereby certify that the foregoing 56 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the Sentencing hearing on the 2nd day of August, 2024, in the matter of:

United States of America

vs.

Darryl Anthony McNeal

Dated this 29th day of August, 2024.

                          _____ S/Candace S. Covey_____

                          CANDACE S. COVEY, LCR, RDR, CRR
                          Official Court Reporter
                          United States District Court
                          Western District of Tennessee